## Case No. 7,223.

### JARROTT v. MOBERLY.

[5 Dill. 253; 10 Chi. Leg. News, 258; 5 Reporter, 583.] [1]

Circuit Court, W. D. Missouri. April, 1878.[2]

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 10 Chi. Leg. News. 258. and 5 Reporter, 583, contain only partial reports.]

[2] [Affirmed in 103 U. S. 580.]

John D. Stevenson, for plaintiff.

Broadhead & Overall, for defendant.

Before DILLON, Circuit Judge, and KREKEL, District Judge.

DILLON, Circuit Judge. This case presents a new question in respect to municipal bonds. The bonds recite that they were issued under the act of March 18, 1870 (Laws 1870, p. 163), in pursuance of an election held March 26, 1872, which was prior to the act of March 29, 1872 (Laws 1872, p. 176), amending the first-mentioned act. This last-named act, of March 29, 1872, has, therefore, no application to the bonds now in suit, and is immaterial, except in so far as it may be regarded as a legislative confession that the original act, authorizing a majority of the qualified voters to create such a debt as the act contemplated, was in conflict with the constitutional provision requiring the assent of two-thirds of the qualified voters. Const. 1865, art. 11, § 14.

The bonds in question recite that they are "issued in pursuance of an election held in said town on the 26th day of March, 1872, to decide whether the said town should purchase and donate to the St. Louis, Kansas City, and Northern Railway Company two hundred acres of land for machine shop purposes." etc., in accordance with the said act of March 18, 1870.

The purchasers of the bonds are, of course, charged with notice of the facts

therein stated. Harshman v. Bates Co., 92 U. S. 569. They knew, therefore, the date of the election, the act under which and the purpose for which the bonds were issued.

The demurrer presents two questions:

1st. The first question is, whether the particular purpose for which these bonds were issued, viz., for "the purpose of assisting and inducing the railroad company to locate and build machine shops upon the land" purchased by the city and donated to the company, is a public purpose in such a sense as to justify compulsory taxation to pay the debt thus incurred.

If such aid had been given to an individual or to a private company proposing to erect shops for manufacturing or repairing machinery, the act would fall within the principles declared and established by the supreme court of the United States in the Iola and Topeka Cases, and would be void. Loan Ass'n v. Topeka, 20 Wall. [87 U. S.] 655; Commercial Nat. Bank v. Iola [Case No. 3,061]; Savings Ass'n v. Topeka [Id. 2,734]. The supreme court there hold that a statute which authorizes the issue of bonds, to be paid by taxation, to aid individuals or private corporations to establish or carry on manufacturing enterprises, is void, because the taxation is not for a public purpose, although, in a remote or collateral way, the local public may be benefited thereby. Same principle: Lowell v. Boston, 111 Mass. 454; Allen v. Jay, 60 Me. 124.

But, as it is settled law in Missouri that aid of this character can be constitutionally given to railroad companies, it would seem to follow that if machine shops are an integral or essential part of a railroad, or necessary for its convenient use and operation (as on this demurrer we ought to assume them to be), then the act of March 18, 1870, under which the bonds in question were issued, is not void within the doctrine of the Iola and Topeka Cases.

2d. The next question is whether the act of March 18, 1870, is in conflict with section 14 of article 11 of the state constitution of 1865. That section provides that "the general assembly shall not authorize any county, city, or town to become a stockholder in or to loan its credit to any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto."

The act of March 18, 1870, under which these bonds were issued, authorized the municipalities therein mentioned to purchase lands and donate, lease, or sell the same to a railroad company as a means of inducing it to locate and build its machine shops on the lands, and assisting it to do so, and for this purpose, to issue its bonds, to be paid by taxation, on the sanction of a majority vote. In the present suit, the bonds recite that the lands were to be purchased by the city and paid for in bonds, and donated to the railroad company; and this, the case of a purchase on credit and a donation, is the precise case now presented for judgment.

If this is a "loan of the credit" of the town to the railroad company, the bonds are void, because the act which authorizes this to be done on a majority vote is in conflict with the constitution, which, in such a case, expressly requires the sanction of a two-thirds vote. What, then, is a "loan of municipal credit" to a railroad company within the meaning of this provision of the constitution?

The provision of the constitution confessedly had its origin in the abuses and frauds which had, prior to 1865, been seen to grow out of the unlimited power of the legislature over the subject. Literally, scores of charters and acts had been passed, authorizing county justices and municipal bodies to subscribe for stock in railways, and to issue bonds without limit as to amount, and without the sanction of the people to be affected.

The plain purpose of the constitution was to prevent or check this in the future, by the provision that municipalities shall not be permitted to incur debts in aid of railways, to be paid by taxation, unless two-thirds of the qualified voters of the municipality should formally assent thereto. The constitution enumerates cities, counties, and towns (the only incorporated public or municipal bodies known to the laws of Missouri), and extended the prohibition to all of them; and it has been held to extend to townships, although not named in the constitutional provision. Harshman v. Bates Co., 92 U. S. 568; Jordan v. Cass County [Case No. 7,517].

As counties, cities, and towns had and could have no considerable funds applicable to such purposes, unless procured on credit, the convention doubtless supposed that a provision that they should not become stockholders in any corporation, or loan their credit to any corporation, without a two-thirds vote, would effectually accomplish the purpose in view, viz., to prevent public debts from being created for the benefit of railway corporations without the previous approval of two-thirds of the voters on whom the consequent taxation would fall.

Constitutional provisions are usually expressed in general terms, and do not descend to the detail often necessary in legislative enactments, and they are intended to secure some essential right, or to prevent wrongs or injuries or abuses. Such provisions are protective and remedial, and are not to be construed with the strictness of penal statutes, but with reference to the public ends sought to be protected or secured. The mischief felt by the constitu-

tional convention of 1865 was that, in the absence of constitutional restriction, the legislature had conferred upon public and municipal officers unguarded powers of dangerous extent, the sting of the evil being the creation of burdensome debts to be paid by taxation. The remedy applied was that for the future municipalities should not be allowed to become stockholders in private corporations (which involves the necessity of paying for the stock), or to loan their credit to such corporations (which involves the creating of a debt for the benefit of such corporations), and both involve the necessity of taxation, unless two-thirds of the qualified voters should assent thereto. If the act of March 18, 1870, which only requires the assent of a majority, is valid, it would have been equally valid if the like power had been conferred without requiring any vote whatever. So that the real question is, whether what was done by the defendant city, as recited in the bonds, was the loan of its credit to the railway corporation within the meaning of the constitutional provision in this regard.

If the bonds in suit had been executed and delivered directly to the railroad company, as the consideration for its agreement to locate its machine shops within the town, then, on the only assumption on which the bonds can be sustained, viz., that such shops are part of the railroad, or necessary for its use, would not the execution and delivery of such bonds to the railway company be the loaning by the town of its credit to the company?

It is not different in essence, and particularly in view of the object of the constitution, viz., to prevent taxing the people without the required consent, that the town sells its own bonds and gives to the company the proceeds, instead of the bonds themselves.

The bonds in question, if valid, create a debt against the defendant city for the benefit of a railroad corporation, and are thus within the mischief or evil which the constitution aimed to remedy. Why, then, should not the constitutional provision be held applicable to these bonds? It cannot be maintained on solid grounds that the barrier of a two-thirds vote, weak and ineffectual as it has proved to be, can be evaded by a mere change of the form of the aid—that is, by giving the aid in the shape of a donation of the proceeds of credit, instead of a subscription for stock, or, instead, giving the bonds directly to the company which the municipality desires to assist.

In my judgment, a municipality "loans its credit" to a railway company, within the meaning of the constitutional provision here involved, whenever it issues its bonds to assist such company in building its road, or any part of it, or to assist it in erecting shops which are necessary or useful in operating its road. Taylor v. Ross Co., 23

Ohio St. 22, 76, 79; Pennsylvania R. Co. v. Philadelphia, 47 Pa. St. 189, 194.

This view has a direct and strong support in the judgment of the supreme court of the state in the Phelps Co. Case, construing this constitutional provision. State v. Curators of State University, 57 Mo. 178. It was there held that the legislature could not authorize a county to issue its bonds to secure the establishment of a public school of mines within its limits, unless the proposition was assented to by a vote of two-thirds of the voters. Napton, J., delivering the opinion of the court, inquires: "What was the object of the (constitutional) restriction on county courts, city and town municipalities?" And he answers: "The object was plainly to prevent them from taxing the people without their consent." The subsequent case, in relation to Forest Park (County Court v. Griswold, 58 Mo. 175), is not considered by the supreme court as inconsistent with the Phelps Co. Case, above referred to.

It is my judgment that the act under which the bonds in question were issued is in conflict with the constitution, and, hence, that the bonds are void, in whosesoever hands they may be. I should have so declared without much hesitation if the question had arisen on an application to enjoin the issue of the bonds. I feel the increased difficulty of so holding in a case where the bonds have been issued upon a vote almost unanimous and afterwards negotiated for value, and where purchasers in actual good faith will be the sufferers if my view is sustained. I desire to add that I am not insensible to the force of the argument so fully presented by Judge Krekel in support of the opposite conclusion, and I cannot but feel more than the usual distrust of my own judgment when it differs from his on a question of local law, and particularly on a question as to the meaning of a provision of the constitution of the state which he, as the president of the convention, assisted to frame.

Fortunately, the result of this difference of opinion is that it will enable the judgment of this court to go for revision to the supreme court, which could not otherwise be done, in consequence of the amount involved not being sufficient. The demurrer will be sustained. and judgment will be entered for the defendant. If desired, we will join in a certificate of division to the supreme court. Judgment accordingly.

KREKEL, District Judge (dissenting). Plaintiff, Jarrott, brings this action against defendant, the city of Moberly, to recover judgment on interest coupons detached from what are termed "Moberly Machine Shop Bonds." The petition sets out a copy of the bonds. showing that the city of Moberly acknowledges itself indebted to W. F. Barrows or bearer in the sum of $500, in current

funds, at the Bank of America, in the city of New York, ten years after date, with interest at ten per cent, payable annually, on presentation of coupons, with option on part of the inhabitants of the town of Moberly to pay the bonds after three years, and payable only by a special tax. The bonds on their face recite that they were issued in pursuance of an election held on the 6th day of March, 1872, to decide whether said town should purchase and donate to the St. Louis, Kansas City, and Northern Railway Company two hundred acres of land for machine shop purposes, the result of said election being two hundred and twenty-eight votes for and one vote against the purchase and donation; and in pursuance to the order of the board of trustees, made on the 18th day of April, 1872, which order was made in accordance with an act of the general assembly of the state of Missouri, entitled "An act authorizing cities and towns to purchase land, and to donate, lease, or sell the same to railroad companies," approved March 18th, 1870. The interest coupons are in the usual form.

The petition is demurred to, setting out for causes that from the petition it appears that the city council of Moberly had no authority in law to issue the bonds, the pretended act of the legislature under authority of which the bonds issued being unconstitutional, and because it appears that the legislature of Missouri exceeded its authority in the passage of said law.

The act, the constitutionality of which is thus brought in question, provides:

"Section 1. It shall be lawful for the council of any city, or the trustees of any incorporated town, to purchase lands, and to donate, lease, or sell the same to any railroad company, upon such terms and conditions as such board may deem proper, for the use of assisting and inducing such railroad company to locate and build machine shops or other improvements upon such lands, and for such purpose to levy taxes upon the taxable property of such city or town, and to borrow money and to issue the bonds of such city or town for such purpose: provided, a majority of the qualified voters of such town or city, at a regular or special election to be held therein, shall assent to such purchase and donation.

"Sec. 2. At such election the poll-books shall be opened, and the ballots headed and styled 'For the Purchase and Donation' and 'Against the Purchase and Donation,' and if a majority of the votes cast shall be 'For the Purchase and Donation,' the proposition shall be deemed to be carried, and in that case the chairman of the board of trustees of any town, or the mayor of any town or city, is hereby authorized to receive and convey, on behalf of said town or city, said land as aforesaid."

The 3d section provides for the giving of notice "for at least two weeks before the terms of the contract to be so submitted as

agreed upon between said railroad company and such common council or board of trustees."

It has been agreed that, for the purpose of this demurrer, all the requirements of the law had been complied with before the issuing of the bonds.

The constitutional provision, in violation of which the law quoted is claimed to have been passed, is found in paragraph 14, art. 9, Const. Mo. 1865, and is in these words:

"Sec. 14. The general assembly shall not authorize any county, city, or town to become a stockholder in or to loan its credit to any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto."

This constitutional provision came up for consideration in the supreme court of Missouri in State v. Curators of State University, 57 Mo. 178, in which the legality of certain bonds issued by the county of Phelps to obtain the location of the school of mines was contested, and it was held that the provision cited applied, and the issuing of the bonds was enjoined, because no vote had been taken. Napton, J., closes his opinion as follows: "It will be observed that this is a case in which the issue of bonds not authorized by the constitution is proposed to be arrested. When the proposed issue is not sanctioned by the requisite vote, we think it a suitable time to prevent the issue. After such bonds have been put upon the market, and purchasers have invested in them, the question of their validity depends upon essentially different principles." In the case before the court, we have a vote taken, the bonds have been put upon the market, and plaintiff is a purchaser of them for value. With these important differences between the cases, I feel free to consider the case before the court without that embarrassment which a difference of opinion with a court of such high standing, passing upon its own constitution, would create. The constitutional provision under consideration has a legislative history commencing with the act of January 27, 1837, incorporating the Louisiana and Columbia Railroad. By the 16th section of that act, county courts were authorized to subscribe stock to the company and issue the notes of the county for such subscriptions, to be signed by all the justices and attested by the clerk, payable at such times and places as might be agreed on. After such subscription, the justices had the right to vote the stock in elections of the company. In the charters afterwards granted to railroad companies, from time to time, by the legislature, this power to subscribe was embodied. No general railroad law was passed until 1853. The act of February 24th, of that year, in its 29th section, granted to the county court of any county, and the city council of any city, the power to subscribe to the capital stock

of any railroad company organized under the act: "Provided, that the county court or city council subscribing or proposing to subscribe to such capital stock may, for information, cause an election to be held to ascertain the sense of the tax-payers of such county or such city as to such subscription, and as to whether the same shall be paid by issues of county or city bonds." The act authorizes the collection of taxes to pay subscriptions and the interest on bonds which may be issued.

These provisions, with the body of the law, passed into the revision of the Missouri statutes of 1855. In the Platte Co. Case, 42 Mo. 171, the supreme court of Missouri decided that this word "may" was obligatory, and must be read as "shall," holding bonds issued without submission void. The legislature soon after passed an amendatory act, by which the word "shall" is substituted for "may."

The only constitutional provisions regarding internal improvements up to 1865 are found in the constitution of 1825, adopted soon after the admission of the state, and are as follows:

"Art. 7. Internal improvements shall forever be encouraged by the government of this state; and it shall be the duty of the general assembly, as soon as may be, to make provision by law for ascertaining the most proper objects of improvement, in relation both to roads and navigable waters; and it shall be their duty to provide by law for a systematic and economical application of the funds appropriated to those objects."

In 1846 a convention framed a constitution, which, on submission to the people for ratification, was rejected. This instrument made no mention of internal improvements. The general corporation act of 1855, regarding the building of plank and macadamized roads, in its 34th section, authorized county courts to subscribe stock to the extent of one-half of the cost of constructing such roads. In no Missouri law or charter, not pertaining to rail, plank, or macadamized roads, is any authority found authorizing municipalities to subscribe stock, with or without submission.

The laws authorizing county courts to subscribe stock in the improvements mentioned remained dormant until the building of railroads, about the year 1850, actually began. The provisions were soon made available by the companies needing funds for their purposes. Desiring railroads, the people quietly stood by and acquiesced in the exercise of the power by the county courts in subscribing stock. The legislative mind first perceived the danger; the requirement of submission in the acts of 1853 and 1855, the change of "may" into "shall" in 1860, the provision of the constitution of 1865 requiring a two-thirds vote, followed. These provisions undertook to keep pace with the rising railroad mania in Missouri.

Congress had made land grants, the state had aided certain railroads liberally, reserving for its security liens on the roads aided, which liens the companies interested sought to remove or subordinate to others. This was the condition of things in Missouri when the convention of 1865 framed the provision in alleged violation of which the act under which the "Moberly Machine Shop Bonds" issued was passed. Let us now examine the provision itself, and seek from its language and import to ascertain whether applicable to the act claimed to be unconstitutional and void. The act, by its terms, seeks to enable cities and towns to purchase lands and donate, lease, or sell them to railroad companies for the purpose of inducing them to build machine shops, or other improvements, upon such lands, requiring a majority vote for sanction. The language of the constitution is: "The general assembly shall not authorize any county, city, or town to become a stockholder in or loan its credit to any company, association, or corporation, unless two-thirds of the qualified voters of such county, city, or town, at a regular or special election to be held therein, shall assent thereto." Did the city of Moberly, by the purchase of lands and donating them to the railroad company, become a stockholder in such company, or loan its credit to it? A stockholder in a railroad company may be said to be one who is interested in the funds of the company, and who assumes the liabilities of a stockholder. The city of Moberly, by virtue of its donation, certainly did not become interested in the funds of the company, nor did it assume any liability of the company—hence, did not partake of the character of a stockholder in any way. It cannot, by any possibility, be brought within the prohibitory language of the constitution, "shall not become a stockholder in any company."

Did it loan its credit to the railroad company? By making a donation it certainly did not loan its credit. But it is said that money was obtained on its bonds, in order to make the purchase of the land. Can this fairly be said to be a loan of credit to the company? I think not. Again, it is said that the constitutional provision is directed against the mischief, and that this case falls within it. And here is the real point in issue—what was, in the light of the legislation of Missouri and the condition of the state, the mischief at which the constitution aimed? Looking at the legislative history and the attending circumstances, the conclusion is, the improvident employment of community credit in railroad enterprises, in which they could have no other than a common interest, and could exercise, if any, but a very limited control.

The Phelps Co. Case, 57 Mo. 178, and the St. Louis Co. Court Case, 58 Mo. 175, may be said, so far as the case under consideration is concerned, to fairly neutralize each other—the first with a leaning adverse to the view here taken, the latter favorable to it.

The constitutional provision under consideration is found in connection with and preceded by a prohibition regarding the state, as follows: "The credit of the state shall not be given or loaned in aid of any association or corporation; nor shall the state hereafter become a stockholder in any corporation or association." The credit of the state had before that time been given or loaned to various railroads, and the state was, in fact, at the time a stockholder in a bank, both of which connections had proven unprofitable, and against them the constitutional provision regarding the state was directed. Following this constitutional provision is found the one in reference to counties, cities, and towns, identical in language, adding the requirement of a two-thirds vote under which they might act in reference to the object named. Next comes the provision denying the legislature power to release the liens which the state had reserved on the railroads when providing for the loan of its credit to them; so that the loan of credit and becoming stockholders, both as affecting the state as well as local communities, was before the mind of the convention. No other matters, except those regarding internal improvements in the larger and extended sense, seem to have been thought of and considered. If the purchasing of property and the donation thereof for the purpose of inducing the location of machine shops, thereby securing a local benefit, had been intended to be prohibited, the word "donation" could easily have been added, as in the constitution of Illinois, which, with this exception, is identical regarding the subject matter. How the legislative mind of Missouri had run on this subject up to 1865, we have seen from what has been stated; how it has since run, the amendment of the act of 1870, requiring a majority only, and its change in 1872, making two-thirds the vote required, and the constitution of 1875, altogether prohibitory, would indicate. This prohibitory clause is as follows (section 6, art. 9): "No county, township, city, or other municipality shall hereafter become a subscriber to the capital stock of any railroad or other corporation or association, or make appropriation or donation, or loan its credit in aid," etc. Thus, by apt words, appropriations or donations are prohibited. The conclusion reached is, that the law under which the "Moberly Machine Shop Bonds" were issued does not conflict with the constitution of 1865, and is a valid act; that the prohibitions of the constitution were not directed against the purchase and donation of property for the purpose mentioned in the act. This being so, the legislature had the power to authorize the city of Moberly to issue its bonds on a majority vote.

Another objection to the validity of the "Machine Shop Bonds" is, that they were not issued for a public purpose. In the Fort Scott Case, 92 U. S. 503, bonds for similar improvements were held valid. The case of Burlington Tp. v. Beasley, 94 U. S. 310, seems to extend and enlarge municipal power. Neither conflicts with the Topeka Case, in which bonds were held void because issued to a private corporation, carrying on its own and exclusively private business. As remarked in one of the decisions of the supreme court of the United States, nearly all of the states have so legislated regarding railroads as to make them public corporations in the essential particulars affecting the interest of the community. State and federal courts have followed in the wake legislation has marked out. Machine shops are a legitimate and necessary part of a railroad, and partake with it of its public character; though they may be locally aided and established, this does not infringe upon or destroy their public character. In parenthesis, I may remark that this case presents, in some aspects, curious features as to legislative and judicial interpretations. The legislature passed the act of 1870, requiring a majority vote in case of donation, then amended it in 1872, requiring a two-thirds vote. The bonds in question upon their face recite that two hundred and twenty-eight votes were cast for and only one against the proposition, thus showing more than a full compliance with the acts of 1870 and of 1872, as well as with the constitutional provision requiring a two-thirds vote. To declare the law under which the bonds issued unconstitutional makes the bonds void, notwithstanding the recital of facts on the face of the bonds that more than the two-thirds required had voted for the issue. Thus the spirit of the law is crushed in the form, and the law made to favor dishonesty rather than honesty. When such is the condition of things, I prefer resolving doubts in favor of the constitutionality of the act giving force to the law enacted by the legislature. On the whole, I am of opinion the demurrer to the declaration should be overruled.